*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*


*UNITED STATES OF AMERICA*    )
    )
*v.*    )    *Criminal Nos. 06-19-P-S*
    )    *06-26-P-S*
    )
*RICHARD DIMOTT,*    )
    )
    *Defendant*    )


*RECOMMENDED DECISION ON MOTIONS TO SUPPRESS*


Richard Dimott, charged with disobeying a lawful command of a court of the United States (an order of conditions of release) by absconding from home confinement, in violation of 18 U.S.C. § 401(3), *see* Indictment (Docket No. 1), *United States v. Dimott*, Criminal No. 06-19-P-S (D. Me.) ("*Dimott* I"), and being a felon in possession of seventeen firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), *see* Indictment (Docket No. 1), *United States v. Dimott*, Criminal No. 06-26-P-S (D. Me.) ("*Dimott* II"), has filed an identical motion in both cases to suppress evidence seized and statements made on April 5, 2005, *see* Motion To Suppress, etc. ("*Dimott* I Motion") (Docket No. 15), *Dimott* I; Motion To Suppress, etc. ("*Dimott* II Motion") (Docket No. 16), *Dimott* II. An evidentiary hearing was held before me on December 12, 2006 at which the defendant appeared with counsel. After both sides rested, counsel for the defendant affirmed that he continued to rely on all bases for suppression identified in his papers but noted that he wished to assert one additional basis – namely that, in executing a warrant to search a vehicle and a storage unit, the government assertedly violated the requirements of Federal Rule of Criminal Procedure 41(f)(1) and (2). Counsel for the

1

government voiced no objection to the raising of the latter claim for the first time at hearing. Accordingly, I have considered it.[1]  Based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that both motions to suppress be denied.

## I.  Proposed Findings of Fact

In late winter and early spring 2005 the York County Sheriff's Office ("YCSO") fielded three calls from Rick Brewer of 324 Sokokis Trail in Limerick, Maine reporting break-ins and other suspicious activity at the home Brewer shared with his wife, Diane Dunning.  On February 28, 2005 Brewer phoned to report that their home had been broken into while they were out, but that nothing was taken.  Brewer told the YCSO that he was able to determine from Caller ID that someone with a "blocked call number" had phoned the home while he and his wife were out; however, his phone was not then set up to trace calls.  He informed the YCSO that his home contained thirty-five to forty firearms.  He also voiced a belief that he was being watched.

On March 26, 2005 Brewer again phoned the YCSO, reporting that someone with a blocked call number had placed a call to his residence while he and his wife were out.  However, he informed the YCSO, this time he had made arrangements to be able to trace calls by dialing *57.  In this instance he had dialed *57, and his phone company had informed him that he had successfully traced the call. Finally, on the morning of April 5, 2005, Brewer called the YCSO to report that he and his wife had returned from a shopping trip to find that their home again had been broken into and that, this time, a number of items had been stolen, including twenty-one firearms and an antique Rolls-brand razor. Brewer further reported that as he and his wife drove home that morning he had noticed two suspicious vehicles: a small silver or gray pickup truck with a blue tarp, which they had passed on the

---

[1] The defendant's counsel also requested permission to file a post-hearing memorandum addressing the evidence adduced at hearing.  I
*(continued on next page)*

road on the way home, and a red Ford Taurus with New Hampshire license plates, which had been parked alongside Route 5. Finally, Brewer told the YCSO that Caller ID again had revealed that someone with a blocked call number had phoned while he and his wife were out that morning. He had dialed *57 and had been informed that he had successfully traced the call.

A YCSO log reveals that, at approximately 12:05 p.m., the YCSO released a "BOLO," or "be on the lookout" alert, for a faded gray Chevrolet S-10 pickup truck with a blue stripe and black tarp over its bed and with three occupants, one described as having dark hair with a beard and mustache, last seen headed south on Route 5 in Waterboro. *See* Defendant's Exh. 1 at 3.

YCSO Detective Steven Thistlewood was assigned as lead investigator in the Brewer burglary case. He and several YCSO colleagues responded to the Brewer-Dunning home. They were joined about an hour or two later by another colleague, YCSO Sergeant Michael Hayes, whom Thistlewood briefed on what had transpired to date. Stephen Hickey, a special agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), also became involved when he happened that morning to stop by the YCSO in connection with an unrelated case, overheard discussion of the Brewer-Dunning burglary and, in part because of the sheer number of firearms involved, offered to lend assistance.

Upon Hayes' arrival at the Brewer-Dunning residence, Thistlewood was in the process of subpoenaeing records from Verizon disclosing the identity of the subscriber or subscribers from whose phone blocked-number calls had been placed to the Brewer-Dunning home. Late that afternoon, Hayes and Thistlewood learned from Verizon that the calls had been placed from an AT&T cell phone belonging to Steven Riquinha of 16 Windsor Drive, Westbrook, Maine. Neither Hayes nor

---

denied that request, expressing confidence that the court could resolve evidentiary conflicts without need of post-hearing briefing.

Thistlewood had heard of Riquinha, and neither was familiar with the Windsor Drive address.  They called John Desjardins, a Westbrook Police Department ("WPD") detective, who agreed to meet with them and serve as their Westbrook "liaison" in investigating the Riquinha lead.  Shortly thereafter Thistlewood, Hayes and Hickey set off, in a caravan of three separate vehicles, to meet with Desjardins at the WPD.  After an approximately fifteen-minute conversation, during which the officers briefed Desjardins on details of the case, the four officers regrouped into two unmarked vehicles (Desjardins and Thistlewood in Desjardins' car, and Hayes and Hickey in Hayes' car), and drove to Windsor Drive, part of a complex known as The Hamlet Coach Trailer Park ("The Hamlet").  *See* Gov't Exh. 1.  The WPD frequently had been called to The Hamlet, and Desjardins was familiar with Riquinha from past law-enforcement work.  Desjardins felt he had developed a rapport with Riquinha and might be able to elicit an honest answer why calls were placed to the Brewer-Dunning residence.

At approximately 6 p.m., the four officers drove past 16 Windsor Drive, the trailer belonging to Riquinha.  They saw no vehicles in the driveway.  They continued on until Windsor Drive dead-ended into Peckham Street, another internal trailer-park road, where they stopped and briefly strategized what to do next.  The plan was for Desjardins and others to begin to interview some of Riquinha's neighbors.  Hayes, accompanied by Hickey, stationed his car on Peckham Street, while Desjardins, accompanied by Thistlewood, parked in a spot diagonally across from the Riquinha trailer.[2]

At some point Desjardins exited his car, leaving Thistlewood alone in it.  Thistlewood observed a silver truck generally matching the description given by Brewer, but without a tarp, travel

---

[2] Hayes plausibly explained that officers decided to attempt to gather as much information as possible about Riquinha from his neighbors, rather than immediately attempting to make contact with anyone who might be in his trailer, because of the potential dangerousness of the situation given the number of firearms reported stolen.

down Windsor Drive and pull into the Riquinha driveway, whereupon three people exited and went into the Riquinha trailer. Thistlewood pulled his unmarked vehicle close enough to the Riquinha driveway to be able to take down the truck's license-plate number, then drove to Peckham Street to inform Hayes and Hickey of the development.[3] At about that time, perhaps because they were summoned by Desjardins although it is not clear, Hayes, Hickey and Thistlewood left to join Desjardins at a trailer on another street within The Hamlet, St. James Street, to interview a resident whom Desjardins thought might have useful information.[4] Desjardins quickly determined that the lead was not fruitful, whereupon the group returned in their two unmarked vehicles to 16 Windsor Drive. Thistlewood immediately noticed, and remarked to his companions, that the truck he had earlier observed was gone. At approximately that time YCSO Deputy Sheriff Stanley Moore joined the group at the trailer park, pulling his marked cruiser (bearing the words "York County Sheriff's Office") in or near the Riquinha driveway. Moore's cruiser was the only marked police car of the three present, and all five officers were in plainclothes.[5]

A decision was made to try to make contact with whomever might be inside the Riquinha residence. While Hayes, Desjardins and Moore stood guard in the yard, Thistlewood and Hickey approached the front door, knocking and announcing their presence several times. No one answered or stirred within. They turned to leave. As Thistlewood was walking down the stairs away from the front door, he observed footprints in a muddy area near the sidewalk that he thought had the same

---

[3] Thistlewood testified that Desjardins was with him and also observed the truck pulling into the Riquinha driveway and its three occupants disembarking and going into the house. However, Desjardins was quite clear that he did not personally observe the truck at that point. I infer that Thistlewood's memory on this point is faulty, and that in fact he was alone when he made this observation.

[4] Hayes testified that the officers converged at the St. James Street residence because of a reported "disturbance." However, he had no memory what the disturbance was. I credit Desjardins' account that the officers simply went to interview a resident in connection with the Brewer-Dunning investigation. In any event, Hayes, Thistlewood, Hickey and Desjardins, all of whom testified at the hearing, agreed that they had gone at this point to St. James Street; the reason is immaterial.

[5] Although in plainclothes, Hayes and Desjardins each wore a necktie with a badge identifying him as a law-enforcement officer.

distinctive circular sneaker pattern as footprints he had seen and photographed at the Brewer-Dunning home. He asked to borrow Hayes' digital camera, which Hayes retrieved and gave him. The time was approximately 6:30 p.m. The light was fading, interfering with Thistlewood's photographic efforts. While Thistlewood was photographing the footprints, Hayes looked up and saw a silver- or gray-colored pickup truck, with one male occupant, heading down Windsor Drive in the direction of the officers. The truck was proceeding at a reasonable rate of speed; however, Hayes noticed that the driver was staring so fixedly at the group of officers that he was no longer paying attention to the road. The driver made an abrupt right-hand turn onto St. James Street (the entrance to which was roughly across the street from the Riquinha residence) into the path of an oncoming vehicle driven by an elderly woman. Hayes threw his hands into the air and screamed, "Whoa, whoa, whoa! What are you doing?" Simultaneously Desjardins, who had also observed this sequence of events, hollered, "Hey!" or "Yo!" The driver abruptly stopped the truck. It came to rest at a 45-degree angle, encroaching into the opposite lane of traffic on St. James Street, mere feet from the oncoming vehicle.[6]

Desjardins beckoned the driver, whom Hickey described as having a "deer in the headlights" look on his face, to get out. He did so. Hayes, Desjardins and Hickey approached the driver (whom all identified in the hearing room as the defendant in this action), and identified themselves to him. Hayes, whom Desjardins described as "pretty animated," asked the defendant what his problem was, stating that he had almost killed a little old lady. The defendant replied that he had just gotten out of prison, the sight of police made him very nervous, and he had panicked. Upon request, he produced his driver's license, which identified him as Richard Dimott, and his vehicle registration.

---

[6] Desjardins described the driver as having made what appeared to him to be a last-minute decision to turn right on St. James Street, in that he did not slow much, jerked the vehicle to the right and made an overly wide turn, ending up in the opposite travel lane. Further, while Desjardins conceded that it is not unusual for people to rubberneck when they observe police officers, Desjardins stated that he *(continued on next page)*

6

Thistlewood, who had joined his colleagues near the defendant, told them that the truck was the same one he had just seen in the Riquinha driveway and that a check of that truck's license plate had revealed the vehicle was registered to a Richard Dimott.  As Thistlewood approached the truck he also observed, and pointed out to other officers, that its wheel wells were covered with mud and grass.  Thistlewood noted that Brewer that morning had called YCSO officers' attention to a track in the lawn of his Limerick home that appeared to have been created by a spinning tire.  While at the Brewer-Dunning residence, Thistlewood had photographed the track.  The defendant's truck was a multicolored Ford Ranger – primarily gray or silver but with blue and red stripes along the bottom. There was no tarp covering the truck bed.  However, Thistlewood observed what appeared to be a black tarp in the truck bed with a tire on top of it.[7]

Hayes patted the defendant down.  He noticed that the defendant had trouble making eye contact or standing still.  Hayes gave the defendant's license and registration to Desjardins, who radioed WPD dispatch and requested that checks be run on them.  The dispatcher informed Desjardins that the truck was registered to Richard Dimott.  No one ultimately cited the defendant for a traffic

_____

deemed the defendant's conduct odd in that he would not take his eyes off of the officers, to the point where it affected his driving and he almost hit another vehicle.

[7] The defendant called a witness who gave a radically different account of the stopping of his vehicle.  Deborah Murchison of 19 Windsor Drive, a neighbor and friend of Riquinha's wife who knew the defendant as a friend of Riquinha's, said she was standing in her driveway on April 5, 2005 watching officers milling about the Riquinha trailer when she heard one of the officers yell, "Stop! Pull the vehicle over."  She testified that she then saw the nose of a vehicle coming to a stop on Windsor Drive, whereupon she recognized the driver as the defendant.  She said that at that point she saw several law-enforcement officers walk alongside the vehicle as the defendant drove it over to St. James Street, parking it at about a forty-five degree angle encroaching into the opposite travel lane.  She denied that she heard any officer yell, "Whoa! Whoa! Whoa!  What are you doing?" or saw any near-accident between the defendant's truck and another vehicle.  I do not find her account of the manner in which the truck was stopped credible.  While Murchison claimed to have heard officers order the truck to stop, she later stated that she could not hear anything after the stopping of the truck because it was "quite a ways off."  Further, her testimony conflicts with that of all other eyewitnesses to that event, who were closer to the truck and who uniformly testified that the defendant made a sudden right-hand turn onto St. James Street, where he stopped in the nick of time to avoid a collision with another car.  Finally, if officers did in fact stop the truck on Windsor Drive, it makes no sense that they would have directed the defendant to position it at a forty-five angle, encroaching into the wrong lane of an adjacent street.

violation.[8]  Desjardins did not retain the defendant's license and registration, although he could not recall if he returned them to the defendant, left them in his truck or gave them to another officer.

Hayes asked the defendant  where he  was coming from and where he was headed.  The defendant said he had come from South Portland and was there to visit a friend.  Hayes or one of the other officers also asked whether the defendant had been to the Riquinha residence.   He denied that he had been.  Hayes informed the defendant that Thistlewood earlier had observed his truck parked in the Riquinha driveway.  The defendant then admitted that he had been there.  Hayes also told the defendant that his truck matched the description of a vehicle seen leaving the scene of a burglary.  He asked the defendant if he was aware of a burglary in which guns were taken or if his vehicle was involved in the commission of a burglary.  The defendant denied any involvement and stated that he did not let anyone use his vehicle.

Hayes asked the defendant if officers could search his truck.  Without hesitation, the defendant agreed.  No one asked the defendant to sign a consent-to-search form.  Approximately five to ten minutes had elapsed since the defendant had stopped his truck on St. James Street.  Thistlewood and Moore began to search the cab of the truck.  At about that time Michael Grasso, another ATF special agent, arrived on the scene, dressed in plainclothes and driving an unmarked vehicle.   Grasso introduced himself to the defendant, who was sitting on a curb not far from his truck.  While the vehicle search was still under way, Grasso overheard the defendant asking if he was free to leave.  Grasso recollected one of the other officers telling the defendant, "Hold on a second.  We'll tell you what's going on."  At about that time the defendant struck up a conversation with Hickey, inquiring, among other things, why ATF was involved.

---

[8] Hickey recalled that at least one officer checked on the status of the driver of the vehicle the defendant nearly hit, and that she *(continued on next page)*

Thistlewood quickly made two significant discoveries, which he shared with Hayes and other officers.  He found an antique Rolls-brand razor and cans of mace identical to a can left at the Brewer-Dunning residence during the break-in, which was believed to have been used to mace the family's dog.  Thistlewood asked the defendant about those items.  He said he knew nothing about them, they did not belong to him, and he did not know why they were in his vehicle.  Thistlewood next phoned Brewer and asked him to describe the stolen Rolls razor.  Brewer provided a detailed description consistent with the item Thistlewood had just seized – noting, for instance, that a serial number on the side of the razor had been worn from constant handling.  Thistlewood thereupon informed the defendant that he believed his truck contained stolen property.  The defendant denied any involvement.  Convinced that he had just recovered stolen property, Thistlewood decided to terminate the search, secure the truck and seek a warrant to search it more thoroughly.  He asked Moore to take the razor to Brewer for an identification, and Desjardins to arrange for the truck's impoundment.  At approximately 7 p.m., Desjardins radioed WPD dispatch to request that a tow truck be sent to the scene to impound the defendant's vehicle.

The defendant asked whether he was free to go.  Thistlewood told him that he was.[9]  He asked if he could take his vehicle.  Thistlewood replied, "No."  The defendant announced that he wanted to cooperate with the investigation.  However, he said he did not want to talk at the scene, in sight of residents who had come out to observe the goings-on.  Desjardins suggested that they talk at the WPD station, but the defendant declined.  The defendant pointed to Hickey and said he wanted to talk to him alone.  Hickey and the defendant repaired to a grassy area at the edge of the road, out of earshot of

_____

reported she was fine.  She backed up, pulled around the pickup truck and went on her way.

[9] Thistlewood testified that although he was convinced that the vehicle was involved in the burglary, he could not at that point link the defendant directly to it.  He said that the defendant repeatedly asked him if he was free to leave, and he repeatedly told him he was.

9

other officers.[10]   As they did so, Hickey noticed part of a tarp (which Hickey described as blue) protruding from beneath a spare tire in the defendant's truck bed.

The defendant told Hickey he wanted to "run over some options."  He seemed to Hickey to be under the misimpression that ATF, as a federal agency, could override the decision of the county and local agencies to impound his truck.  Hickey explained that ATF had no authority over those agencies.  He told the defendant that with that many firearms involved, ATF's priority was getting them off the streets before something happened with them.  While conversing on the grass, the defendant also told Hickey: "I want to speak hypothetically."  Hickey replied that he did not know what the defendant meant by that, but the defendant could do that.

While the defendant and Hickey conversed at The Hamlet, the defendant asked Hickey at least twice whether he was under arrest.  Hickey told him that ATF did not plan to arrest him that day unless something changed significantly.  The defendant also asked at one point if he could leave. Hickey told him he was free to go; however, Hickey had also previously advised him that it looked fairly bad for him as far as his involvement in the burglary, that Hickey did not believe he was the ringleader, and that any information the defendant gave would be relayed to the United States Attorney's Office and most likely work in his favor.

After a period of time, Grasso joined Hickey and the defendant.  The defendant told both agents that if he was to help them, he wanted to leave the location.  He suggested that he and Hickey go for a ride, noting that he did not want any of the local officers involved.  Hickey told the defendant that, per standard ATF officer-safety protocol, two agents (both himself and Grasso) would need to accompany the defendant.  The defendant agreed, and the three departed the scene in Grasso's

---

[10] At hearing Desjardins voiced the opinion, as a detective who had been involved peripherally in the burglary investigation, that from
*(continued on next page)*

vehicle.[11]  At approximately 7:30 p.m. – it is not clear whether just before or just after the defendant departed with the ATF agents – a tow-truck operator arrived and removed the defendant's vehicle from The Hamlet.[12]  The other officers dispersed.  Hayes, for example, went home for the night, and Thistlewood returned to the WPD.  During the period of time the defendant was at The Hamlet with officers, no one told him he was under arrest.[13]

It is standard ATF protocol, when transporting a suspect who is in custody in an unmarked vehicle with no cage, for the suspect to be handcuffed and for one agent to sit in the backseat with him.  In this case, although Grasso's vehicle had no cage, Hickey sat in front with Grasso while the defendant sat alone in the backseat.  The defendant was not placed in handcuffs.  The defendant said he was thirsty, and Grasso drove to a convenience store.  All three exited the car and went inside.  The defendant was free to move about the store.  One of the agents bought him a drink, and the three returned to the car, resuming the same seats as before.

Grasso had the impression that, commencing at the time the defendant first began speaking with ATF agents at The Hamlet, he was "playing a little game with us," giving out limited amounts of information in piecemeal fashion and trying to discover what the agents knew.  The defendant initially denied any involvement in the burglary.  Later, he admitted that his vehicle had been used in the

_____

his observations at The Hamlet the defendant was controlling the situation.

[11] The defendant initially asked if he could go for a ride with the agents in his own vehicle.  Hickey again advised him that was a state or local issue and not one in which ATF could intercede on his behalf.

[12] Richard Grovo, the Maietta Towing employee who removed the defendant's truck from The Hamlet on April 5, 2005, testified that one person was in handcuffs at the scene.  However, when pressed on cross-examination how he knew the person was handcuffed, he made clear that he had assumed this was so because the person's hands were behind his back.  He admitted that he had not actually seen handcuffs and had not seen the person's back, and that it was possible the person merely had put his own hands behind his back.  Inasmuch as Grovo did not actually see handcuffs on the defendant, and his testimony conflicts with that of other eyewitnesses who denied that the defendant was handcuffed at any time while at The Hamlet, I do not credit it.

[13] Both Grovo and Murchison testified that they observed an unmarked law-enforcement vehicle or vehicles blocking one or both ends of the defendant's truck while it was parked on St. James Street.  Desjardins, a generally credible witness, denied this.  Such positioning, if done, would have been consistent with the decision to impound the truck.  Thus I find that, if the defendant's truck was blocked, it was blocked following the decision to seize it.

commission of that crime.  Eventually, he said he could tell the agents who had used his vehicle.  However, he asked for an opportunity to phone people to give them a chance to do the right thing before naming names, reiterating that he wanted to see his child that night.  Still later, he told Hickey and Grasso that they did not need to worry about guns being on the street.  He said that he knew where all twenty-six firearms were, and offered to take the agents to them.[14]  The ATF agents, who had remained in touch with Thistlewood during their ride with the defendant, contacted him to meet with them.  Thistlewood, who was not familiar with Westbrook, suggested he meet them in the parking lot of the Hannaford store in Westbrook, which he knew he could find.  Upon Thistlewood's arrival, he was advised that the defendant would lead investigators to the stolen firearms if he did not get arrested that evening for receiving stolen property.  Thistlewood got into the backseat of Grasso's vehicle; however, the defendant soon asked him to leave.  Thistlewood promptly did so.  He got back into his own vehicle and waited.[15]

After five or ten more minutes, the defendant said he would take the agents to the location of the guns.  He directed Grasso to Trailers Diversified, a storage facility in Gorham, Maine.  Thistlewood followed behind in his own vehicle.[16]  On arrival, the ATF agents called others to the storage facility, including their supervisor David Brown, ATF resident agent-in-charge.  The defendant told Hickey and Grasso they would find twenty-three guns in a storage unit there.  Grasso asked where the other three firearms were; the defendant said they were in his truck.  The defendant

---

[14] No explanation was given at hearing for the discrepancy between Brewer's report that twenty-one firearms were missing and the defendant's statement to ATF agents that he knew where all twenty-six firearms were.  In any event, the discrepancy is immaterial.

[15] Thistlewood also testified, on both direct and cross-examination, that he might have seen the defendant at the WPD prior to seeing him at the Hannaford parking lot but was not sure that he had.  Inasmuch as he was uncertain whether he had in fact seen the defendant at the WPD, and neither Grasso nor Hickey testified that they had taken the defendant there, I find that the defendant was not brought to the WPD after leaving The Hamlet.

[16] Both Hickey and Grasso denied that they had promised the defendant that if he told them where the guns were, he would not be arrested.  They testified that the defendant queried whether, if he took them to the firearms, he would not be arrested, whereupon *(continued on next page)*

identified the storage unit in which the firearms were stored and provided the agents with a key that he reassured them was the only key to the unit.  As the agents waited for their supervisor, Brown, to arrive, Hickey began asking pointed questions about the burglary.  During that conversation, for about five minutes, the defendant framed his replies in hypothetical terms.[17]  Grasso recalled the defendant at one point asking, "Can I have a ride out of here?" and being told: "Let us just get this settled, and we'll talk about where we'll go."  While conversing with Hickey, the defendant was sitting in the backseat of Grasso's car.  However, he had not been ordered to remain there, and both doors were open.

After consulting with an Assistant United States Attorney, ATF agents decided, in view of the lateness of the hour, to secure the storage unit (by posting guards outside of it) pending issuance of a search warrant, which they would seek the following morning.  At no time on April 5, 2005 did Grasso or Hickey read the defendant *Miranda* rights.[18]  The ATF did not place the defendant under arrest that day.  However, at approximately 10 p.m. – about a half an hour after the defendant's arrival at the storage facility – Thistlewood arrested him on state burglary charges.  For the first time since encountering officers earlier in the day, the defendant was placed in handcuffs.  Thistlewood arrested the defendant at the direction of his YCSO supervisor, who expressed concern that the defendant would try to leave.  Thistlewood transported the defendant in handcuffs to the York County Jail.  He did not at any time that day advise the defendant of *Miranda* rights.  Thistlewood recalled no conversation relevant to the federal investigation transpiring during the trip to jail.  He did tell the

---

Hickey again reiterated that ATF had no intention of arresting him that evening unless something changed significantly.

[17] For example, when Hickey asked what the defendant was doing at the Brewer-Dunning residence, the defendant responded: "Hypothetically, the guy's a drug dealer, what do you think we went there for?"  Hickey answered, "cash," whereupon the defendant stated: "Hypothetically, yes, but since there was no cash, we'd take the guns, hypothetically."

[18] Per *Miranda v. Arizona,* 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

defendant he would be interested in talking to him about the case. The defendant replied that he did not want to talk to him that night but would do so the next day. When Thistlewood came to the jail the following day, the defendant refused to speak with him.

On the morning of April 6, 2005 ATF agents applied to this court for a warrant to search the storage unit and the defendant's pickup truck, on the strength of an affidavit signed by Hickey. Hickey related, *inter alia*:

1.      Brewer's three reports to the YCSO, including the report on April 5, 2005 that the residence had been broken into and a number of items taken, including twenty-one firearms and an antique Rolls razor; the tracing of blocked calls placed to the Brewer-Dunning residence on March 26, 2005 and April 5, 2005 to Riquinha; and Brewer's and Dunning's observation while traveling down Sokokis Trail back toward their home on the morning of the burglary of a small gray pickup truck with a blue tarp over the bed traveling toward them (and away from the direction of their residence). *See* Application and Affidavit of Stephen E. Hickey, Jr. ("Hickey Aff.") (Docket No. 1), *United States v. Dimott*, Magistrate No. 05-30-WSB (D. Me.), ¶¶ 3-4, 6.[19]

2.      Observation at the Brewer-Dunning residence, following the burglary, of (i) a can of mace that did not belong to Brewer or Dunning, (ii) a sneaker print with spirals in the snow near the location of the break-in, and (iii) marks on the side lawn that appeared to have been caused by a vehicle leaving at a high rate of speed. *See id.* ¶ 5.

3.      Observation by Thistlewood, while watching the Riquinha residence, that a small, gray pickup truck (with no tarp) matching the description given by Brewer and Dunning had pulled into the driveway and three occupants had exited and gone into the Riquinha residence; and discovery by

---

[19] The Hickey affidavit contains two paragraphs numbered 3. *See* Hickey Aff. I refer to both.

Thistlewood and Desjardins that the vehicle was registered to the defendant.  *See id.* ¶ 7.

4.      Hickey's observation while at the Riquinha residence that the gray pickup truck was making its way down Windsor Drive, then swerved quickly to the right onto a side street, nearly striking another vehicle, whereupon Hayes called the driver out of the truck and identified him as its registered owner, the defendant.  *See id.* ¶¶ 8-9.[20]

5.      Observation by Thistlewood of fresh mud and short blades of lawn grass that appeared to match that of the side lawn of the Brewer-Dunning residence on the right rear-quarter panel of the truck, *see id.* ¶ 10, as well as Thistlewood's observation while at the Riquinha residence of a sneaker footprint in the mud just below the lowest porch step identical to the print observed at the Brewer-Dunning residence, *see id.* ¶ 8.

6.      Discovery by Thistlewood, after obtaining consent from the defendant to a search of the truck, of three cans of mace matching the can found in the room where stolen firearms were located and of an antique Rolls razor.  *See id.* ¶ 10.

7.      Details of Hickey's interview of the defendant, including the defendant's willingness to provide a key to the Trailers Diversified storage unit in which he said twenty-three of the guns were located "as long as he would not be arrested[,]" and confirmation from the owners of Trailers Diversified that the storage unit was leased to Riquinha.  *See id.* ¶¶ 11-12.

At 10:43 a.m. United States Magistrate Judge William S. Brownell issued the requested warrant.  *See* Search Warrant, attached to *id.*  Grasso was among those present when the storage unit, which contained firearms, tools and household goods, was opened later that day.  Hickey inventoried items removed from the storage unit, and returned the warrant to Magistrate Judge Brownell on April

---

[20] Hickey was mistaken in stating that Hayes called the defendant out of his truck.  Hayes testified that he did not do so.  However, the *(continued on next page)*

8, 2005.  *See* Defendant's Exh. 2.  Judge Brownell was not personally present when Hickey conducted

the inventory; however, Hickey verified to Judge Brownell that it was an accurate inventory.  *See id*.

at 3.  The return reflects that the inventory was made in the presence of ATF supervising agent Brown.

*See id*.

## II.  Discussion

### A.  *Dimott* I Motion

The government objects to the *Dimott* I Motion on the basis that it has no bearing on the *Dimott*

I charge.  *See* Government's Response to Defendant's Motion To Suppress, etc. (Docket No. 17),

*Dimott* I.  I agree.  The defendant's identical suppression motions target the conduct of YCSO, WPD

and ATF officers and agents on April 5, 2005.  *See generally Dimott* I Motion; *Dimott* II Motion.  The

*Dimott* I indictment charges that on or about March 2, 2006 the defendant knowingly disobeyed an

order of conditions of release by absconding from home confinement.  *See* Indictment (Docket No. 1),

*Dimott* I.  The defendant does not elucidate, and I cannot discern, how statements he made, and

evidence seized, in Westbrook and Gorham, Maine on April 5, 2005 have any relevance to the *Dimott*

I criminal contempt-of-court charge.  Accordingly, I recommend that the *Dimott* I Motion be denied.

Alternatively, assuming *arguendo* that the evidence sought to be suppressed does have some bearing

on the *Dimott* I charge, I recommend that the *Dimott* I Motion be denied for the reasons discussed

below.

### B.  *Dimott* II Motion

With respect to *Dimott* II, the defendant seeks to suppress evidence on the bases that officers

(i) detained him without reasonable and articulable suspicion and subsequently arrested him without

---

discrepancy is immaterial inasmuch as another officer, Desjardins, testified that he did beckon the defendant to step outside.

probable cause, (ii) searched his truck without either a warrant, probable cause or valid consent, and the search was in any event the fruit of the illegal stop, (iii) elicited statements from him involuntarily and in the absence of required *Miranda* warnings, (iv) relied on a search-warrant affidavit that, when stripped of illegally obtained evidence, does not establish probable cause to search the vehicle and storage unit, and (v) inventoried items seized pursuant to the search warrant in a manner that did not comport with the requirements of Federal Rule of Criminal Procedure 41(f)(1) and (2). *See, e.g.,* *Dimott* II Motion.[21]

The government rejoins that officers (i) had reasonable articulable suspicion, if not probable cause, to stop the defendant's vehicle, remove him from it, pat him down and conduct a brief investigation, (ii) obtained the defendant's lawful consent to a search of his truck (and, alternatively, evidence then seized is admissible pursuant to the so-called inevitable-discovery rule), (iii) were not required to provide the defendant *Miranda* warnings because he was not "in custody" until 10 p.m. on April 5, 2005, (iv) did not coerce any statement from the defendant, (v) relied, for search of the vehicle and storage unit, on an affidavit supplying probable cause for the search (and, alternatively, evidence seized during those searches is admissible pursuant to the so-called "good faith" exception to the exclusionary rule), and (v) executed the warrant for search of the storage unit in conformity with Rule 41(f). *See, e.g.*, Government's Objection to Defendant's Motion To Suppress, etc. ("*Dimott* II Objection") (Docket No. 18), *Dimott* II.

The government bears the burden of proving (i) *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), (ii) the voluntariness of a confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990), and (iii) the lawfulness of warrantless

---

[21] I use the term "officers" to refer to any or all law-enforcement officers involved in the Brewer-Dunning investigation on April 5-6, *(continued on next page)*

searches and seizures, s*ee, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992). With respect to the defendant's challenge to the lawfulness of searches undertaken pursuant to the warrant issued on April 6, 2005, he bears the initial burden of demonstrating the warrant's invalidity. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir.1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant."). With respect to the defendant's Rule 41(f) challenge, a defendant bears "the burden of proof in challenging the validity of the execution or service of the search warrant." *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981).

For the reasons that follow, I find that the government meets its burden of demonstrating the lawfulness of officers' conduct with respect to warrantless searches and seizures (including investigative detention), voluntariness of statements and *Miranda* compliance on April 5, 2005, and that the defendant falls short of meeting his burden of demonstrating the invalidity of searches and seizures conducted pursuant to the warrant issued on April 6, 2005.

### 1. Investigative Detention; Ultimate Arrest

The defendant first contends that, in violation of his Fourth Amendment rights, he was (i) unlawfully detained at The Hamlet without reasonable, articulable suspicion and (ii) ultimately

2005, including YCSO, WPD and ATF agents, detectives and officers.

placed under *de facto* arrest in the absence of probable cause.  *See Dimott* II Motion at 3-4.

The First Circuit has observed:

> In *Terry v. Ohio*, [392 U.S. 1 (1968)], the Supreme Court first recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.  This authority permits officers to stop and briefly detain a person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.

*United States v. Trueber,* 238 F.3d 79, 91-92 (1st Cir. 2001) (citations and internal punctuation omitted).  As the First Circuit has further elaborated:

> The law governing investigative stops is well understood.  A law enforcement officer ordinarily may not stop someone and restrain his freedom to walk away unless the officer has a reasonable and articulable suspicion of criminal activity.  The reasonable suspicion test has been described as an intermediate standard requiring more than unfounded speculation but less than probable cause.  At a minimum, the officer must have a particularized and objective basis for suspicion.  When determining the legitimacy of an investigative stop, a court must undertake a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior.

> An investigative stop also must be reasonably related in scope to the circumstances which justified the interference in the first place.  If a law enforcement officer reasonably suspects criminal activity, he may briefly question the suspect about his concerns.  If he has a reasonable basis to suspect that the subject of his inquiry may be armed, he also may frisk the suspect and undertake a limited search of the passenger compartment of any vehicle in which he is sitting.  Once again, context is vital in determining the permissible scope of an investigative stop.

*United States v. Cook*, 277 F.3d 82, 85 (1st Cir. 2002) (citations and internal quotation marks omitted).  In this case, the defendant technically stopped his own vehicle to avoid a near-collision, rather than being pulled over by police.  Nonetheless, Desjardins immediately beckoned him out of his truck, and Hayes questioned him, patted him down and requested consent to search his vehicle.  The encounter thus fairly can be characterized as an investigative, or *Terry*, stop.

As an initial matter, officers were justified in approaching and questioning the defendant on the

basis of his erratic driving alone.  The defendant had made a sudden, wide right turn, encroaching on the wrong travel lane of St. James Street and nearly striking another vehicle.  Even in the absence of any suspected link whatsoever to the Brewer-Dunning investigation, officers reasonably could have stopped and questioned the driver to satisfy themselves that he was not operating under the influence of drugs or alcohol or otherwise unfit to be behind the wheel.

Beyond this, even as officers approached the truck, Thistlewood observed and commented that the vehicle was the same one he had just seen in the Riquinha driveway, which he had determined was registered to a Richard Dimott.  That vehicle, in turn, generally matched Brewer's description of a truck seen in the vicinity of his home shortly before he discovered the break-in: Although the defendant's vehicle was a Ford rather than a Chevrolet, did not have a tarp over the truck bed and had red and blue stripes along the bottom, it was primarily a silver or gray pickup truck.  Officers already knew that the cell phone from which blocked calls had been placed to the Brewer-Dunning residence belonged to Riquinha.  Moreover, Thistlewood had just been in the process of photographing a footprint near the Riquinha trailer that he reasonably could have inferred had been left by one of the three individuals he had seen exiting the Dimott vehicle a short time earlier, and that he believed was identical to a distinctive footprint he had seen at the Brewer-Dunning residence.

The defendant's own conduct only heightened officers' growing and ample suspicions.  He had stared so fixedly at them and their vehicles (including the marked YCSO cruiser) that he neglected to pay attention to the road.  He also had made what Desjardins reasonably deduced was a last-minute decision to turn right onto St. James Street, nearly striking an oncoming vehicle.  The defendant's apparent attempted flight was in itself, in the circumstances, highly suspicious.  *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

In short, as officers approached the defendant, they had ample reason to suspect that he and/or his vehicle were linked to the Brewer-Dunning burglary. They then did precisely what *Terry* contemplates, undertaking diligent means of investigation to confirm or dispel that suspicion. They questioned the defendant, ran a check of his license and registration, made observations of the outside of his vehicle and sought his consent to search his truck. Those measures, in turn, quickly confirmed their suspicions. Thistlewood observed mud and grass on the truck's wheel well; earlier that day, he had photographed a track on the Brewer-Dunning lawn believed to have been left by a spinning tire. Thistlewood and Hickey both noticed a tarp protruding from beneath a spare tire in the truck bed; the truck seen by Brewer reportedly had a tarp covering its truck bed. During questioning the defendant appeared nervous and had trouble making eye contact or standing still. He gave shifting answers to the questions posed – initially denying that he had been to the Riquinha residence and then admitting that he had in fact been there when confronted with the observation that Thistlewood earlier had seen his vehicle parked in the Riquinha driveway. Finally, during the search of the truck's cab, Thistlewood discovered what fairly can be described as smoking-gun evidence of a link between the defendant's truck and the Brewer-Dunning burglary: cans of mace identical to a can found at the Brewer-Dunning residence that did not belong to either Brewer or Dunning and had been believed to have been used to mace their dog, and an antique Rolls razor that Thistlewood confirmed, in a conversation with Brewer, was his. No more than half an hour had elapsed since officers first had approached the defendant.

At this point – if not sooner – officers had probable cause to arrest the defendant on state charges of burglary and/or receipt of stolen property. *See United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) ("Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would

believe the suspect had committed or was committing a crime.  The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances.  Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.") (citations and internal punctuation omitted); *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999) (an officer's determination that a crime has been committed need not be "ironclad" or even "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause); *Roche v. John Hancock Mut. Life Ins. Co*., 81 F.3d 249, 255 (1st Cir. 1996) ("[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").  However, rather than placing the defendant under arrest then and there, in an abundance of caution Thistlewood decided to impound his vehicle, seek a warrant for its further search, and leave the defendant to his liberty.  At that point, the *Terry* stop had ceased.  Nonetheless, officers did not then proceed, as the defendant suggests in his papers, *see Dimott* II Motion at 4, to effectuate his *de facto* arrest.

"[A]n investigatory stop constitutes a *de facto* arrest [for which probable cause is required] when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." *Flowers v. Fiore*, 359 F.3d 24, 29 (1st Cir. 2004) (citations and internal quotation marks omitted).  There is no evidence that any officer laid a hand on the defendant while at The Hamlet, apart from Hayes' brief patdown.  The patdown did not "convert" the *Terry* stop into an arrest; rather, it constituted a legitimate officer-safety measure in view of the fact that officers harbored reasonable suspicion that the defendant was linked to a burglary in which twenty-one firearms had been reported stolen. *See, e.g., Florida v. J.L.*, 529

22

U.S. 266, 272 (2000) (given serious threat firearms and armed criminals pose to public safety, "*Terry*'s rule . . . permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause"); *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) ("[I]n determining whether a pat-down search is an appropriate step following a valid *Terry* stop, the key is whether, under the circumstances, the officer is justified in believing that the person is armed and dangerous to the officer or others.") (citation and internal quotation marks omitted). Nor did any officer brandish a weapon at the defendant, place him handcuffs, inform him that he was under arrest or otherwise restrict his freedom of movement. Indeed, when the defendant questioned Thistlewood following termination of the truck search whether he was free to go, Thistlewood confirmed that he was. While the defendant could not have driven out of The Hamlet in his own truck, which had been seized, he could have called a friend, relative or cab for a ride or simply have walked out of the trailer park. No reasonable person in the defendant's shoes, as of that time, would have understood his situation to be tantamount to being under arrest.

Instead, from all that appears, the defendant made a calculated choice to stay and attempt to minimize the damage emanating from his chance encounter with police by cooperating with ATF agents. From the time the *Terry* stopped ceased at approximately 7 p.m. until the time the defendant was placed under arrest by Thistlewood in Gorham at approximately 10 p.m., he was calling the shots: He identified Hickey as the sole person with whom he wished to speak and conversed with him out of earshot of other officers; he suggested that he go for a ride with Hickey; he gave permission for Grasso to join them; he refused to deal with local or county officers; he ordered Thistlewood out of the backseat of Grasso's car; and he attempted unsuccessfully to negotiate the release of his truck and a guarantee that he would not be arrested that day. The defendant repeatedly asked Grasso and Hickey whether he was under arrest or would be placed under arrest; they repeatedly assured him that absent

23

a significant change, ATF had no plans to arrest him that day.  Nothing Grasso or Hickey did was inconsistent with that assurance.  In contravention of ATF protocol for transport of suspects "in custody," they left the defendant alone and unhandcuffed in the backseat of Grasso's car.  They also permitted him to walk freely about a convenience store at which they stopped to obtain a drink, and did nothing to physically restrain him while at Trailers Diversified in Gorham.

In short, the defendant was not placed under *de facto* arrest at any time prior to his official arrest by Thistlewood at approximately 10 p.m.  There can be no serious question that, when Thistlewood did arrest the defendant that evening on a state charge of burglary, he had probable cause to do so.  As noted earlier, such probable cause had been developed, at the latest, as of the time the *Terry* stop ceased at approximately 7 p.m.  The defendant's conduct and statements during the intervening time had only widened the base of probable cause: The defendant had confessed he knew who had committed the burglary, had led agents to the storage unit where he said twenty-three of the guns were stored, had produced what he represented was the only key to the unit, and had stated that three other guns would be found in his truck.

For all of the foregoing reasons, the government carries its burden of demonstrating that the defendant was neither unlawfully detained nor arrested during his encounter with officers on April 5, 2005.

## 2.  Search of Truck

The defendant next argues that the search of his truck was unlawful on grounds, *inter alia*, that any purported consent was involuntary.  *See Dimott* II Motion at 4-5.  He argues that consent given during an illegal detention is invalid, and that any evidence discovered as a result of such a search is inadmissible unless the taint of the illegal conduct is somehow dissipated.  *See id.* (citing, *inter alia, Wong Sun v. United States,* 371 U.S. 471 (1963)); *see also, e.g., United States v. Woodward*, 173 F.

24

Supp.2d 64, 71 (D. Me. 2001), *aff'd*, 43 Fed. Appx. 397 (1st Cir. 2002) (evidence is suppressible as fruit of poisonous tree, pursuant to *Wong Sun*, if it has "been come at by exploitation of the illegality as opposed to by means sufficiently distinguishable to be purged of the primary taint") (citation and internal punctuation omitted).  The government counters, *inter alia*, that the defendant gave valid consent to the search.  *See Dimott* II Objection at 9-10.

"Valid consent renders a warrantless search constitutionally permissible, and while consent must be voluntary to be valid, there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it."  *United States v. Perez-Montañez*, 202 F.3d 434, 438 (1st Cir. 2000).  "It is the prosecution's burden to establish, by a preponderance of the evidence, that consent was freely and voluntarily given; there must be more than mere acquiescence in the face of an unfounded claim of present lawful authority."  *Id*. (citation and internal quotation marks omitted).[22] "The district court's conclusion as to whether consent was freely given must take into account the totality of the circumstances surrounding the interaction between the defendant and the authorities."  *Id.* This interaction, in turn, is measured by a standard of "objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999) (citations and internal quotation marks omitted).

At the outset, I reject the defendant's contention that his consent was "fruit of the poisonous tree."  I have already concluded, based on the facts as I propose they be found, that the detention of the defendant at The Hamlet was lawful.  The question remains whether the defendant voluntarily

---

[22] While the question sometimes is framed as one of whether consent has been "freely and voluntarily" given, the concepts are equivalent.  *See, e.g., United States v. Drayton*, 536 U.S. 194, 206 (2002) ("We turn now from the question whether respondents were seized to whether they were subjected to an unreasonable search, *i.e.*, whether their consent to the suspicionless search was *(continued on next page)*

consented to the search.  At hearing, the government adduced uncontradicted evidence that approximately five to ten minutes after officers first approached the defendant, Hayes asked him for consent to search his truck, which he gave without hesitation.  There is no evidence that the officers said or did anything to coerce the defendant to give that consent unwillingly.  Moreover, throughout the defendant's encounter with officers that day, he evinced a willingness and ability to cooperate to the extent it suited his purposes and to decline to cooperate when it did not – for example, choosing to deal with Hickey but not with local or county officers.  Against this backdrop, I have no difficulty concluding that the defendant consented to a search of his truck, and did so voluntarily.  The truck search accordingly was lawful.

### 3.  Voluntariness of Statements; *Miranda* Compliance

The defendant next seeks to suppress statements made to officers on April 5, 2005 on the bases that (i) requisite *Miranda* warnings were not given, and (ii) his statements in any event were involuntary, having been coerced by promises of leniency.  *See Dimott* II Motion at 5-6.

The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted).  Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Id*. (citation omitted).  The determination whether there was such a restraint on freedom of movement hinges "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the

---

involuntary."); *United States v. Chhien*, 266 F.3d 1, 7 (1st Cir. 2001) ("Consent is voluntary if it is the product of an essentially free *(continued on next page)*

person being questioned." *Id*. at 323.  *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted).  "Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

For purposes of *Miranda* analysis, the defendant's interactions with officers on April 5, 2005 can be divided into three periods: (i) the period from approximately 6:30 p.m. to 7 p.m. during which officers conducted a *Terry*-type investigation, (ii) the period from approximately 7 p.m. to 10 p.m. during which the defendant conversed with ATF agents, and (iii) the period after 10 p.m., when Thistlewood placed the defendant under arrest.  At no point during the day did any officer administer *Miranda* warnings to the defendant.

The defendant acknowledges that, as "a general rule, *Terry* stops do not implicate the requirements of *Miranda*." *Dimott* II Motion at 5 (quoting *United States v. Streifel*, 781 F.2d 953, 958 (1st Cir. 1986)).  However, he posits that in this case, the *Terry* stop evolved into a *de facto* arrest, at which point *Miranda* warnings were required.  *See id*. at 5-6.  I disagree.  As discussed above, once the *Terry* investigation ceased, and Thistlewood made clear to the defendant that he was free to leave, the defendant chose instead to speak to ATF agents.  During the roughly three hours the defendant spent in the company of Hickey and Grasso, he was not handcuffed or otherwise restrained, was reassured that he was not under arrest, and was permitted a degree of control over his

and unconstrained choice.") (citation and internal quotation marks omitted).

environment inconsistent with "custodial" interrogation: for example, Grasso and Hickey took the defendant for a ride at his own suggestion and did not countermand his request that Thistlewood leave Grasso's car.

Unquestionably, once Thistlewood placed the defendant under arrest and handcuffed him at approximately 10 p.m., the defendant was "in custody" for *Miranda* purposes. Any statements thereafter elicited from him via "interrogation" accordingly would be inadmissible in the absence of *Miranda* warnings. Nonetheless, Thistlewood testified, in effect, that no conversation of consequence ensued. *En route* to the jail, Thistlewood expressed an interest in talking to the defendant about the case; however, the defendant replied that he would talk to him the following day. When Thistlewood came to the jail the next day, the defendant refused to speak with him.

Inasmuch as the government demonstrates that the defendant was not "in custody" during the *Terry* investigation or the interview with ATF agents and was not "interrogated" by Thistlewood following his 10 p.m. arrest, it meets its burden of showing compliance with the dictates of *Miranda.*

I turn to the question whether the defendant's statements nevertheless were made involuntarily. Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments. *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation

28

omitted).

In this case, the defendant suggests that the police overbore his will, and extracted confessions from him, by promises of leniency.  *See Dimott* II Motion at 6.  I am unpersuaded.  The evidence adduced at hearing suggests that the defendant made a calculated choice to speak with ATF agents – and only ATF agents – in a bid to minimize the damage flowing from his encounter with officers at The Hamlet.  Up until the time of his arrest by Thistlewood, he continued to make calculated choices regarding the amount of information he would divulge and the timing and manner in which he would divulge it – for example, only to ATF agents, in a car away from The Hamlet, and in some instances only "hypothetically."  Further, he continued to make statements despite having been told, upon inquiry to Hickey and/or Grasso, that he was not under arrest and was free to leave.

Beyond this, neither Hickey nor Grasso promised the defendant that he would evade arrest if he confessed or showed them the location of the guns.  Rather, the defendant queried whether, if he took them to the firearms, he would not be arrested.  In response, Hickey merely reiterated what he had been saying to the defendant from the outset of their conversation: that ATF had no intention of arresting him that evening unless something changed significantly.  Moreover, Hickey had explained early on to the defendant that ATF had no authority to "trump" the county and local agencies involved in the Brewer-Dunning investigation.  The defendant extracted no promise from local or county authorities – with whom he had refused to deal – that they would not place him under arrest on state charges.[23]  A unilateral hope of lenient treatment does not render a confession involuntary.  *See, e.g., United States v. Rowley*, 975 F.2d 1357, 1361 (8th Cir. 1992) ("Although Rowley's statements were

---

[23] While Thistlewood was told, upon arrival at the Hannaford parking lot, that the defendant would lead investigators to the stolen firearms if he did not get arrested that night for receiving stolen property, there is no evidence that Thistlewood engaged in negotiations with the defendant or otherwise relayed agreement to those terms.

given in the hope of leniency, they were not given with the promise of leniency, and thus were not involuntary on that score.").

Nor, finally, did Hickey's statement that he would relay the fact of any cooperation to the United States Attorney's Office constitute coercion sufficient to overbear the defendant's will (even as glossed with Hickey's further observations that it looked fairly bad for the defendant and that relaying his cooperation to the United States Attorney's Office most likely would work in his favor). Hickey did not promise that any particular benefit would materialize if the defendant confessed. In any event, the First Circuit has expressed doubt that even a false promise that a suspect would not be prosecuted undermines the voluntariness of a confession. *See United States v. Byram*, 145 F.3d 405, 408 (1st Cir. 1998) ("[I]t would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution.") (emphasis in original).

For the foregoing reasons, the government meets its burden of demonstrating that statements made to ATF agents on April 5, 2005 were voluntary.

### 4. Validity of Search Warrant

The defendant next argues that, stripped of evidence obtained illegally, the Hickey Affidavit does not supply probable cause to search his vehicle or the Gorham storage unit. *See Dimott* II Motion at 6. This claim hinges on the merit of the defendant's prior assertions that evidence was in fact garnered illegally. I have recommended that the court find otherwise. Should the court agree, that is fatal to the defendant's bid to suppress evidence seized pursuant to the warrant.[24]

---

[24] The defendant does not assert that the Hickey Affidavit on its face failed to supply probable cause to search his vehicle or the Gorham storage warrant. *See Dimott* II Motion at 6. Such a claim transparently would have no merit. The Hickey Affidavit established a number of ties between the defendant's truck and the Brewer-Dunning burglary, not least of which was the discovery of the cans of mace and the antique Rolls razor. The Hickey Affidavit further conveyed a high probability that the stolen firearms likely would be found in the storage unit based on the defendant's own statements to that effect and confirmation from the owners of Trailers Diversified that the unit the defendant had identified belonged to Riquinha, from whose cell phone the suspicious calls to the Brewer-
*(continued on next page)*

### 5. Rule 41(f) Compliance

Following the close of evidence at hearing, the defendant's counsel asserted for the first time that the warrant issued for search of the defendant's vehicle and the Gorham storage unit was not executed in compliance with Rule 41(f). That rule provides:

> **(1)  Noting the Time.**  The officer executing the warrant must enter on its face the exact date and time it is executed.

> **(2)  Inventory.**  An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person.

With respect to Rule 41(f)(1), defense counsel initially argued that the return on the warrant failed to indicate the date and time of its execution. However, I pointed out, and he conceded, that the return in fact indicates that the warrant was executed on April 6, 2005 at 11:30 a.m. *See* Defendant's Exh. 2 at 3.

With respect to Rule 41(f)(2), defense counsel noted that the return indicates that an inventory of the contents of the storage unit was made in the presence of ATF supervising agent Brown but not in the presence of the storage unit's owners, Riquinha and his wife. *See id*. Hence, he reasoned, pursuant to the plain language of the rule, an inventory should have been prepared and verified in the presence of at least one other credible person. He noted that, while the inventory was verified to Magistrate Judge Brownell, it was not prepared in his presence. Accordingly, he concluded, ATF did not comply with Rule 41(f)(2) in executing the warrant.

Counsel for the government, confronting this argument for the first time at hearing, countered that either Brown or Magistrate Judge Brownell, in whose presence Hickey swore that the inventory

---

Dunning residence had been placed.

was a true and detailed account of the property taken by him pursuant to the warrant, *see id.*, qualified as "at least one other credible person" for purposes of Rule 41(f)(2).

I need not resolve whether Brown or Magistrate Judge Brownell so qualifies. "Violations of Rule 41(d) [predecessor to Rule 41(f)(2)] are essentially ministerial in nature[,] and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith." *Marx*, 635 F.2d at 441. *Accord United States v. Dauphinee*, 538 F.2d 1, 3 (1st Cir. 1976) ("Although we think that it would have been better practice if the return had stated that the revolver was found and seized, we do not think that the government agent's failure to make an accurate return requires suppression of the evidence in this case. The various procedural steps required by Rule 41(d) are basically ministerial. Appellant has not demonstrated that he was prejudiced by the failure of the return to mention the revolver, and there is no indication that the government was not acting in good faith. Under these circumstances the district court did not err in denying the motion to suppress insofar as it was based on the wording of the return.") (citations and footnotes omitted); *United States v. Hubbard*, 493 F. Supp. 209, 221 (D.D.C. 1979), *aff'd*, 668 F.2d 1238 (D.C. Cir. 1981) ("[I]t is interesting to note that failure even to complete an inventory is merely a ministerial violation which does not affect the validity of the search."). Even assuming *arguendo* that the warrant in this case was not executed in compliance with Rule 41(f)(2), the defendant has made no showing of prejudice flowing therefrom or intentional or bad-faith non-compliance. That is fatal to his bid for suppression on this ground.

### III. Conclusion

For the foregoing reasons, I recommend that both of the defendant's motions to suppress be **DENIED**.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 21st day of December, 2006

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge